IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN RIDDICK,

   Plaintiff,

v.

ROBERT DEAN,
PHILLIP MORGAN,
SHANEA ROSS,
TODD TAYLOR,
DAMEAN STEWART,

   Defendants.

Civil Action No.:  JRR-24-3604

**MEMORANDUM OPINION**

    Self-represented Plaintiff Steven Riddick filed this civil rights complaint against Defendants Robert Dean, Phillip Morgan, Shanea Ross, Todd Taylor, and Damean Stewart, alleging he was subjected to cruel and unusual punishment by virtue of extreme heat that existed at Jessup Correctional Institution ("JCI") where he is incarcerated.  ECF No. 5 (Amended Complaint).  In response, the Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  ECF No. 17.  In response to Defendants' motion, Riddick filed a Motion to Stay and for Discovery.  ECF No. 23.  Riddick also filed a Motion for Summary Judgment.  ECF No. 26.  Defendants oppose Riddick's motions.[1]   ECF Nos. 29 and 31.

    The matters pending before the Court have been fully briefed; there is no need for a hearing. Local R. 105.6 (D. Md. 2025).  For the reasons that follow, Defendants' Motion to Dismiss or, in

---

[1] Defendants also filed Motions to Seal Medical Records (ECF No. 19), to Withdraw as Attorney (ECF No. 28), and for Extension of Time to file Response to Riddick's Motion for Summary Judgment (ECF No. 30).  All of these motions shall be granted.

the Alternative, for Summary Judgment, construed as a Motion for Summary Judgment, shall be granted.

## I. BACKGROUND

### A. Complaint Allegations

Riddick alleges that he arrived at Jessup Correctional Institution ("JCI") on June 24, 2024. ECF No. 5 at 5. He was assigned to "A Building, B Wing, Cell 603." *Id*. He alleged it was extremely hot in the cell, which lacked ventilation; and he was not provided a fan or allowed to buy one. *Id*. Riddick claims that the extreme heat caused him symptoms of depression, anxiety, exhaustion, lethargy, disorientation, lightheadedness, shortness of breath, restlessness, insomnia, unintended weight loss, headaches, chest pain, heart flutters, nausea, and dehydration. *Id*. at 5-6. He adds that he required mental health care and was placed on medications for chest pains, depression, anxiety, and "sleep deprivation." *Id*. at 6. Riddick further asserts that Defendants could have provided small fans to the "intake inmates," including Riddick, which would have avoided the deleterious symptoms he experienced. *Id*. He also avers that fans are made available to inmates in administrative segregation and general population, and were once made available to intake inmates. *Id*.

According to Riddick, the temperature in his cell felt like it exceeded 100 degrees; he could not stop sweating. ECF No. 5 at 7. He claims that the dayroom was also extremely hot, and the shower water was "piping hot, almost burning the skin." *Id*. Riddick states that he "sweat heavily" while taking showers and complains that he was required to return to a hot cell after his shower. *Id*. Riddick asserts, presumably as a result of the heat, he did not feel like socializing or engaging with people. *Id*.

2

Riddick claims he made all Defendants aware of the problem by filing an "ARP, Request for Admin[istrative] Remedy in July 2024." ECF No. 5 at 8. He sent a letter to the Commissioner advising that he had spoken to Warden Dean about his cell conditions. *Id*. Riddick claims that Warden Dean said that, "at one time," JCI issued fans to inmates who did not have one or could not afford to buy one, and asked Riddick if he had received one. *Id*. Riddick told Warden Dean he had not received a fan. *Id*. Riddick claims Dean answered his ARP, which was denied, and that he appealed the dismissal to the Commissioner but did not receive a response, so he appealed the non-response to the Inmate Grievance Office ("IGO"). *Id*. at 8-9. The IGO directed him to forward his ARP. *Id*. at 9.

Riddick asserts that each of the named Defendants has a duty to ensure daily JCI operations are carried out correctly and that inmates are not subject to cruel, unusual, and inhumane conditions such as inadequate heat in the winter and no relief from heat in the summer. *Id*. He adds that Warden Dean was "the top prison staff in JCI" and Shanea Ross was "the top security staff." *Id*. at 9-10. Riddick further recounts that Todd Taylor is second in command for the Department of Correction ("DOC"); Phillip Morgan is third in command for DOC; and Damean Stewart is second in charge at JCI. *Id*. at 10. According to Riddick, each Defendant "should know if the prison operations & security is being carried out correctly." *Id*. Riddick sues Defendants in their respective individual and official capacities for violation of his Eighth Amendment right to be free from cruel and unusual punishment. *Id*. at 11. He urges that each Defendant was "deliberately indifferent to my serious need of relief from the extremely hot cell condition & by subjecting me to cruel inhumane cell conditions & not allowing me a[] fan in the cell & by subjecting plaintiff to extremely hot shower water & showers." *Id*.

3

As relief, Riddick seeks unspecified compensatory and punitive damages. *Id*. at 11. Additionally, Riddick asks that the Court issue an injunction requiring Defendants to allow intake inmates to order fans and to provide them with fans in the summer season. *Id*. at 12.

**B.    Defendants' Response**

Defendants dispute Riddick's claim that any of his health conditions was the result of being confined in a cell with intolerably high temperatures. Rather, they assert that his symptoms/conditions about which he complains existed before he arrived at JCI, and that Riddick never attributed any of the reported symptoms to excessive heat when he was seen by health care providers. ECF No. 17-1 at 10-11. Mental health care records dated during the summer months following Riddick's arrival at JCI indicate he was treated for long-standing issues with anxiety and depression, as well as PTSD, sleep disturbances, and flashbacks that cause heart palpitations.

On June 30, 2024, Riddick explained during his initial psychiatric evaluation that he had a history of anxiety and depression that existed prior to his incarceration. ECF No. 18 at 97. Previously, Riddick had been transferred to Maryland from the Virginia Department of Corrections, where he had been incarcerated at the Red Onion facility since 2011. *Id*. He reported that he is anxious around crowds since being struck by another inmate while at Red Onion in 2020, and claimed a history of auditory hallucinations. *Id*. at 98.

On July 12, 2024, Riddick reported that he was then assigned to a single cell due to his mental health conditions and stated that he had been in solitary confinement for 17 years while in the custody of Virginia Department of Correction. ECF No. 18 at 89. He attributed his nightmares to being stabbed while in Virginia. *Id*. Riddick also allows that he always had a problem with "resting" and had been taking Benadryl to help with sleep "particularly with the heat." *Id*. at 90.

4

On August 12, 2024, Riddick was seen by a provider in response to a sick call slip Riddick submitted complaining of anxiety, depression, paranoia, intermittent chest pain when he experiences anxiety, and PTSD. ECF No. 18 at 72. Riddick reported "sleep disturbances, flashback, [and] nightmares that [are] very frequent." *Id*. Riddick attributed his symptoms to the incident that occurred in Virginia where he was attacked by another inmate while Riddick was handcuffed. *Id*.

Aside from Riddick's pre-existing mental health conditions, Defendants point to the absence of any statement by Riddick to providers that his symptoms were attributable to the heat in his cell, or the hot water in the shower. ECF No. 18.[2] Defendants further assert that when Riddick complained he had no cold water or ventilation in his cell, maintenance repaired Riddick's sink and found he ventilation system was working properly. ECF Nos. 17-1 at 10, 17-2 at 3-7. Defendants explain that, contrary to Riddick's assertion that he never received a response to his ARP filed in July 2024 regarding his cell and shower conditions, a response to his ARP was provided on July 9, 2024. ECF No. 17-2 at 8. The response provided by the Warden states that Riddick "alleged the Maintenance Department did not fix a water leakage in a timely manner." *Id*. at 3. Dismissal of the ARP was based on the finding that the Maintenance Department repaired the leak on July 11, 2024. *Id*. Defendants also point out that the Maintenance Repair Order states that the ventilation system in Riddick's cell was working. *Id*. at 6.

On October 1, 2024, Riddick appealed the Warden's dismissal of his ARP to the Incarcerated Individual Grievance Office ("IIGO"). ECF No. 17-3 at 6-7. Riddick complained that he had appealed the Warden's response approximately 45 days before he filed the appeal to the IIGO but had not received a response. *Id*. He added a claim to the ARP that he had not been

---

[2] Defendants also observe that Riddick did not lose weight during the relevant time frame; rather, he gained weight. On June 24, 2024, Riddick weighed 198 pounds. *Id*. at 114. On October 10, 2024, he weighed 210 pounds. *Id*. at 60.

allowed to order a fan. *Id*. at 7. The IIGO sent a letter to Riddick dated October 18, 2024, stating that they required a copy of his complaint to the Warden, any receipt from the Warden, his appeal to the Commissioner, any receipt from the Commissioner, and any response from the Commissioner. *Id*. at 4. Because Riddick did not comply with the directive, his IIGO appeal was dismissed. *Id*. at 3.

**C.      Riddick's Motion for Summary Judgment**

In his Motion for Summary Judgment, Riddick states that the temperatures inside his cell during the months of June, July, and August of 2024 reached 90 to 100 degrees Celsius.[3] ECF No. 26 at 2. He claims the cell did not have adequate ventilation and reiterates that he did not have a fan, resulting in the injuries outlined in his Amended Complaint. *Id*. at 2-3. Riddick explains that the ventilation system in his cell was not designed to cool his cell and that its only function "is to pull in air through the vent" but it does not blow air into the cell. *Id*. at 3-4. He adds that he believes the vent was not working because when he held a tissue up to it, it barely moved, whereas if it had been working properly, the tissue would have been pulled into the vent. *Id*. at 4-5. Riddick also states that the window in his cell allowed sun to shine into his cell, causing his cell to become even hotter throughout the day. *Id*. at 5-6.

In rebuttal to Defendants' assertion that none of Riddick's medical or mental health complaints resulted from hot conditions inside his cell, Riddick states that Defendants fail to produce evidence that his hot cell did not result in his injury, and that they cannot say with certainty which of his symptoms is attributable to the complained-of conditions, and which is not. *Id*. at 8-9. Riddick further argues that even if he had the conditions noted prior to being in the hot cell at JCI, exacerbation of pre-existing conditions and symptoms constitute an injury. *Id*. at 10. He

---

[3] The Court assumes Riddick means Fahrenheit.

states, "put another way, if someone with high blood pressure, diabetes & or heart conditions . . . is exposed to heat and the heat elevates & or worsens his med[ical] conditions leading to stroke, heart attack or death, then the heat caused an injury & you can make an [sic] reasonable claim that it did because if the person wasn't exposed to the heat at the time of exposure [the] injury wouldn't have occurred." *Id.* 10-11. He points out that inmates in other states (like Texas) have died due to the heat inside the prisons, leading the courts to require the state to provide air conditioning inside those prisons. *Id*. at 12-13.

Riddick also takes issue with Defendants' argument that instead of losing weight during the relevant time period, he gained weight. *Id*. at 14. He acknowledges that he gained weight but states his weight gain occurred in October, after the heat had subsided. *Id*. He reiterates that his Amended Complaint centers on the time period between June 24 through August 2024. *Id*.

Riddick also asserts Defendants are not entitled to qualified immunity because a reasonable prison official would and should have known that failure to provide safe cell conditions, to include "a working toilet, running water, adequate ventilation, heat in the winter, proper lighting & sanitation & AC," is a violation of the Eighth Amendment. *Id*. at 15-16. He adds there was no reason to treat intake inmates differently from general population and administrative segregation inmates who were allowed to buy fans. *Id*. at 20.

Riddick includes two inmate affidavits of individuals incarcerated at JCI. The first, from Montray Williams, attests that the ventilation system "only pulls and sucks air in but doesn't blow out to cool the cells when the temperatures reach[] 70º to 75º degrees and above in the summer." ECF No. 26-1. Williams adds that the cells get "dangerously hot in the summer" and that this is especially true for people who suffer from "medical conditions such as asthma." *Id*. The second affidavit is from Tony Stone; he attests that he was housed on the intake unit with Riddick from

7

June to August 2024.  ECF No. 26-2 at 1.  He verifies that intake inmates were not allowed to buy fans, the cells had no air conditioning, had no ventilation, and the water in the shower was always piping hot.  *Id*.  He claims that Riddick told him "numerous times that the heat in his cell and dayroom and shower made him sick," and states he was aware that Riddick sought and received medical and mental health care.  *Id*.  According to Stone, he saw Riddick "numerous times" when he looked sick and "had an [sic] low quality of life."  *Id*. at 2.  Stone adds that the heat made him sick too.  *Id*.

**D.**   **Defendants' Opposition Response**

With regard to Riddick's Eighth Amendment claim, Defendants assert that he has failed to cite any precedent in either his Amended Complaint or his Motion for Summary Judgment to support the position that incarcerated individuals are entitled to fans, air conditioning, or cold air in their cells.  ECF No. 31 at 8.  Rather, Defendants argue that the controlling legal standard requires only that prison officials provide "reasonably adequate ventilation."  *Id*. (citing *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980)).

Defendants also state that two days after Riddick submitted an ARP about the temperature in the cell, maintenance staff inspected the ventilation system and determined it was operating as it should.  ECF No. 31 at 8, *see also* ECF No. 17-2 at 6.  Riddick did not, however, file an ARP about not being able to buy a fan.  *Id*.  Additionally, Defendants state, and the court is entitled to take judicial notice of the fact, that the National Weather Service recorded the average temperature for the region surrounding Baltimore Washington International Airport ("BWI") during June 2024 as 77.6 degrees Fahrenheit; during July 2024 as 82.2 degrees Fahrenheit; and during August 2024 as 77 degrees Fahrenheit.  *Id*. (citing https://www.weather.gov/wrh/Climate?wfo=lwx).  Defendants add that "on most evenings during this period, the temperature fell below 75 degrees

Fahrenheit." *Id*. Riddick points to no admissible evidence to generate a dispute of fact on these points.

Defendants further point out, and Riddick does not challenge, that Riddick had a starting weight of 198 in June of 2024. ECF No. 31 at 10, *see also* ECF No. 17-3 at 114. On June 25, 2024, he weighed 204 pounds (ECF No. 17-3 at 104); on July 12, 2024, he weighed 206 pounds (*id*. at 87); on July 23, 2024, he weighed 211 pounds (*id.* at 81); and on August 2, 2024, he weighed 211 pounds (*id.* at 77). Thus, Riddick gained weight during the operative period of time and, according to Defendants, cannot establish a significant injury resulting from the challenged conditions.

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss or, in the Alternative, for Summary Judgment

Defendants' motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d); *Adams Hous., LLC v. City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (*per curiam*). As is the case here, when a movant titles its motion "in the alternative" as one for

9

summary judgment, and submits matters outside the pleadings for the Court's consideration, the parties are deemed on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings [] offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it[,] or simply not consider it." 5 C Wright & Miller, FEDERAL PRACTICE & PROC. § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

**B.   Discovery**

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011); *Putney v. Likin*, 656 F. App'x 632, 638–39 (4th Cir. 2016) (*per curiam*); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for

10

specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. FED. R. CIV. P. 56(d); *see also Harrods Ltd.*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs. LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit … is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods Ltd.*, 302 F.3d at 244 (citations omitted). Despite the absence of the non-moving party's Rule 56(d) affidavit, however, the Court shall not issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit places "great weight" on the Rule 56(d) affidavit, and holds that mere "reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit," the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary," and

11

the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods Ltd.*, 302 F.3d at 244–45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008)(same). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Here, Riddick has filed a Motion to Stay and for Discovery. ECF No. 23. In his motion, he requests an order requiring Defendants to provide all operations manuals for vents in inmate cells, showers, etc., that specifically pertain to the function and purpose of the vent. *Id.* at 2. He further asks for a statement from DOC administrative and/or maintenance staff as to whether the "cells, showers, etc. have AC and if the cells/showers, dayroom, etc. can get dangerously hot or hot in the summer's hot temps without AC and with the vent sucking in air into the vent." *Id*. at 3. Defendants oppose Riddick's motion, stating that the deficiencies in the Amended Complaint cannot be cured by the information sought because the deficiencies are "purely legal in nature" and can be resolved under Rule 12(b)(6) without resort to discovery. ECF No 29. Because this Court will rely on evidence outside of the operative pleading, Rule 12(b)(6) will not be the sole standard considered; and Riddick has not demonstrated that discovery is necessary for his opposition to Defendants' Motion for Summary Judgment.

Discovery cannot be requested pursuant to Rule 56(d) "simply [to] demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d

637, 641 (D. Md. 2011), *rvs'd on other grounds*, (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If Riddick's proposed discovery is provided and establishes that the cells *can* get hot without air conditioning, it does not establish facts needed to prove that he was confined under conditions amounting to cruel and unusual punishment during the relevant time frame. Further, his request for operations manuals and an explanation regarding the purpose of the ventilation system does not have any bearing on his allegations that he was confined under conditions that violate the Eighth Amendment or whether Defendants were aware of it but did nothing to correct it. Riddick's motion shall be denied.

**C.      Summary Judgment**

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48(1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002); *see F.D.I.C. v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013)(same).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644–45.  Therefore, in the face of conflicting evidence raising disputes of material fact, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact.  *See Anderson*, 477 U.S. at 247–48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." 477 U.S. at 252.  And, "the mere

14

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because Riddick is self-represented, his submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III.   DISCUSSION

#### A.   Official Capacity Claims

Based on the nature of the claims, the facts alleged, and the requested relief, Riddick raises claims against Defendants in their official capacities. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Defendants are immune from suit for actions taken in their official capacities.

#### B.   Personal Participation

A viable claim under 42 U.S.C. § 1983 requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must

15

affirmatively show that the official acted personally to deprive the plaintiff of his rights). Relatedly, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that the subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate as to demonstrate "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Beyond Riddick's assertions that former Warden Dean and Warden Stewart should have known that the conditions existed in the housing unit, he does not allege that they failed to take corrective action to mitigate the heat. The undisputed facts before the court are that Riddick was

provided cold running water in his cell and the ventilation system was verified to be working two days after he complained about the ventilation and the lack of cold water. Riddick's allegation that he had a conversation with Warden Dean about the heat does not amount to a tacit authorization of misconduct resulting in constitutional injuries. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). Further, as set forth more fully below, even accepting the allegations as true, the conditions alleged do not amount to an Eighth Amendment violation.

**C.      Eighth Amendment**

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions that are merely restrictive, even those that are harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*. In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or

demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011).

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference such that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 302-303 (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily[,] yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

When evaluating claims alleging excessive heat, courts consider the summer temperatures, humidity, ventilation, and severity and duration of the exposure. *See Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004). "[A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Id.* (citing *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) ("While the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment.")). During times of extreme heat, a reasonable prison official must afford remedial measures such as "the provision of fans, ice water, and daily showers," or the diversion of cool air and distribution of personal ice containers. *Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) (citations omitted).

Although Riddick claims the time frame he has complained about was a time of extreme heat, evidence from a neutral, admissible source—the National Weather Service—establishes otherwise; and he has failed to generate a triable issue on this point. Thus, admonition that a prison official must take certain actions to mitigate "extreme heat" would not appear to pertain in this case; regardless, the undisputed facts are that prison officials responded to Riddick's complaints by taking prompt steps to ensure and confirm the water and ventilation systems were operating properly. Specifically, it is undisputed that two days after Riddick filed an ARP regarding the water and the ventilation in his cell, maintenance came to his cell, fixed the water, and verified the ventilation system was working. While Riddick added a claim about his inability to purchase a fan as an intake inmate when he appealed his ARP to the IIGO, that claim was never presented to the Warden for a response. It is therefore unknown, and the court will not speculate, whether Riddick would have been permitted to obtain a fan.

Further, the undisputed record evidence is that Riddick did not lose weight as a result of the heat as he asserts in his Amended Complaint. Rather, contemporaneous admissible prison records bear out that Riddick gained weight during the relevant period; and he fails to offer competing evidence to generate a triable issue on this point. Further, the symptoms he describes in his Amended Complaint as resulting from the heat did not coincide with his exposure to the challenged conditions. Riddick himself reported that he had always had issues with sleeplessness; that he had a history of anxiety and depression; and that he had experienced hallucinations prior to his arrival at JCI. Despite having ample opportunity to do so, Riddick never attributed any exacerbation of those symptoms to his confinement under the challenged conditions. Thus, his claim additionally fails because he cannot establish a serious or significant physical or emotional injury resulting from the challenged conditions.

## IV. CONCLUSION

For the reasons discussed herein, there is no dispute of material fact and Defendants are entitled to judgment as a matter of law in their favor. By separate Order, the Court GRANTS Defendants' alternative Motion for summary judgment; GRANTS Defendants' Motion to Seal; DENIES Riddick's Motion to Stay and for Discovery; DENIES Riddick's Motion for Summary Judgment; GRANTS Defendants' Motion to Withdraw as Attorney; and GRANTS Defendants' Motion for Extension of Time *nunc pro tunc*.

/S/
_____

February 18, 2026

Julie R. Rubin
United States District Judge